CHARLES KIMBALL SMALL and RUTH WEST SMALL, Plaintiffs-Appellants, Cross-Appellees, *v.* ALVIN BADENHOP and PATRICIA PORTER BADENHOP, Defendants-Appellees, Cross-Appellants

NO. 9483

(CIVIL NO. 60810)

JUNE 10,1985

LUM, C.J., NAKAMURA, PADGETT, HAYASHI, AND WAKATSUKI, JJ.

OPINION OF THE COURT BY NAKAMURA, J.

Charles and Ruth Small brought suit against Alvin and Patricia Badenhop, "seeking to have a constructive trust imposed on two properties [now owned by Alvin Badenhop[1]], to wit, a 5,141 square-foot property which Plaintiffs [had] owned in fee simple and a 34,091 square-foot property which Plaintiffs had purchased on an agreement of sale." Imposition of a trust was sought on grounds that the smaller parcel had been conveyed to the defendants and they had been permitted "to take over [the] agreement of sale . . . [covering the larger parcel] pursuant to and in reliance on certain representations and promises . . . and an underlying agreement between the parties to develop the two properties on a

---

[1] The trial judge's finding that title to the parcels of land in question was conveyed to Alvin Badenhop rather than to the defendants as cotenants is substantiated by copies of Land Court documents in the record.

joint basis." Though the findings entered by the circuit court justify the award of judgment and equitable relief to the Smalls, it ruled "the claim of the Plaintiffs [was subject to dismissal] by reason of laches and the statute of limitations." Concluding from a review of the record that the suit was not barred by laches, we reverse the judgment and remand the case to enable the circuit court to fashion an appropriate remedy.

I.

The land in question consists of two parcels of real property situated at Kailua, Oahu, Hawaii. Charles Small, a building contractor, and his wife agreed to purchase the larger parcel from Agnes Kaiulani Chalmers in 1959 for $17,045.50; they made an initial payment of $500 and further agreed to make monthly payments of at least $100, including interest at the rate of 6% per annum on the unpaid balance of the purchase price. The agreement of sale, however, called for the full payment of the purchase price in five years.

The adjoining smaller parcel was acquired in fee by the Smalls in 1960 for the modest sum of $1,500. The lot, though steeply sloped and practically "unbuildable," was purchased with the notion that it would be consolidated with the larger parcel and the consolidated lot would then be subdivided into four 10,000 square-foot lots. Thus, a Land Court order amending the title document for the larger parcel to cover the ownership of the smaller parcel was obtained. The order, however, expressly provided that the two lots could only "be sold as a whole unless consolidated and resubdivided in accordance with relevant rules and regulations of the Land Court of the State of Hawaii and relevant laws of said State." *In re Crocker,* No. 505 (Hawaii Land Ct. Oct. 25, 1960) (Order No. 18466 granting petition to amend Land Court Order No. 5925).

Alvin Badenhop, an architect, and Mrs. Badenhop became interested in the larger parcel in 1959 when they responded to the Smalls' solicitation of possible buyers for part of the land. The Badenhops expressed a desire to acquire either the entire parcel or a part thereof to build a home. However, they left Hawaii early in 1960 to live abroad, and their plans for the construction of a residence were temporarily shelved. But absence from Hawaii did not

diminish their interest in the particular parcel. On several occasions in his correspondence with Charles Small, Alvin Badenhop reiterated a desire to eventually have his home there.

The Badenhops returned to Hawaii in 1963 and acquired a house in the neighboring community of Lanikai. However, they still retained hopes of building a home on the land in question, and Charles Small and Alvin Badenhop continued to explore possibilities for the development of the two unimproved parcels as residential lots. In late 1964 a zoning variance making possible a subdivision of the parcels into four lots was approved by the City and County of Honolulu upon the Smalls' application. But unbeknownst to the parties the land had been placed within a conservation district by the State Land Use Commission, thereby precluding its use for residential purposes.

Meanwhile, the Smalls were encountering difficulty in making the monthly installment payments due the seller of the larger parcel. They also were unable to fulfill the obligation to pay the entire purchase price on August 10, 1964, when the "balloon" payment stipulated by the agreement of sale fell due. The attorneys for the executor of the estate of Agnes Kaiulani Chalmers informed them in December of 1964 that the sum of $15,298.25 was still owing under the agreement and interest for the period between July and December of 1964 amounting to $458.94 remained unpaid. They were also delinquent in the payment of real property taxes.

Finding himself in a financial bind, Charles Small decided to close his contracting business and seek employment elsewhere. During the Smalls' two-year sojourn in Samoa, however, Charles Small and Alvin Badenhop continued to exchange thoughts on the development of the property in question through correspondence.[2] They also discussed other investment possibilities, as well as other matters of mutual interest, in their frequently exchanged letters.

The exchange of views during this period was centered initially on the threatened loss of the larger, "buildable" parcel brought on by the default in payments under the agreement of sale and means to avert the loss. The discussions ran the gamut of possibilities,

---

[2] Most, if not all, of the letters exchanged during this period had not been discarded and were introduced in evidence at trial.

including an outright sale of the property to someone else. But Badenhop, who had assumed the responsibility of dealing with the problem in the absence of the Smalls, assured Charles Small that he would get "something" for the "loss in equity" despite any sale.[3]

Badenhop eventually succeeded in preventing the loss by purchasing the parcel from the executor of the estate of Agnes Kaiulani Chalmers for the sum of $15,986.66, approximately what was due under the agreement of sale. But before the sale could be consummated, it was necessary that a cancellation of the earlier agreement of sale and an extinguishment of the Smalls' right of redemption thereunder be recorded in the records of the Land Court.

Badenhop thus apprised the Smalls in August of 1965 that documents serving to relinquish their redemptive rights were being prepared by his attorney. In the same communication he asked them to "grant [him] the deed to lot #70 [the smaller parcel] by signing the enclosed 'quitclaim deed.' "[4] Letter from Alvin Badenhop to Charles Small (Aug. 6, 1965). "This," he stated, was "absolutely vital" and "[a]ll has been thoroughly studied over by the attorney and to save our interests has to be done this way." *Id.*

The Smalls complied with the request to "grant [Badenhop] the deed to Lot #70" and the conveyance was effected for a nominal consideration. But the grantee advised the grantors in the same letter that "[t]he amount of $10.00 stated and hereby enclosed, is merely a formality and by no means represents the amount I intend to pay to you eventually." *Id.* He again acknowledged that the Smalls retained an equity in the larger parcel. "Just as for lot #68 [the larger parcel]," he reiterated, "I expect that at some future

---

[3] For example, the letter from Badenhop dated April 17, 1965 contained this passage:

> If Marshall puts up money and grabs the deed as security — I have to let him have something. Let me know how serious you are about eventually wanting to have a house there. In any case, if you *don't* when the whole deal is pau I will see that you get out something to make up for your loss in equity. That would be the least I could do; the best I can do is save you a house-site.

[4] The conveyance of this lot was necessary because of the provisions of Land Court Order No. 18466 that the two lots "be sold as a whole unless consolidated and resubdivided in accordance with relevant rules and regulations of the Land Court . . . and relevant laws."

date we will get together and mutually work out our equity in the land." *Id.*

Subsequently, after his attorney had informed the Smalls that a petition seeking a cancellation of their agreement had been filed in the Land Court, Badenhop wrote that he had been assured of financing for the improvement of the property. It was imperative, he said, that he acquire "clear title to the land" so the necessary financing could be obtained.[5] An order cancelling the agreement was entered thereafter by the Land Court with the Smalls' acquiescence, and Badenhop acquired the clear title he wanted. But the endeavor to develop the land for residential purposes was still stymied for yet another reason.

To his dismay Badenhop learned in early 1966 that the parcels had been "zoned for conservation" by the Land Use Commission. The letter communicating the discovery of one more roadblock to the realization of the project oozed frustration. The strongly worded message to the absent parties was: "We can't build on it, we can't subdivide, we can't sell off part of it or, probably, borrow any more money on our present equity in the thing. In short, we have had it." Letter from Alvin Badenhop to Mr. and Mrs. Small (Apr. 1, 1966).[6]

Despite the setback Badenhop persevered in his efforts to salvage what was possible. He again toyed with the notion of selling a

---

[5] The following is an excerpt from the Badenhops' letter to Charles Small dated August 27, 1965:

> I'm in the process of checking out every phase of the financing of the property (houses that is), and have been assured by Bob Bartlett (Mgr. of Bank of Hawaii/Kailua Branch) that he will help me finance building up there. I cannot get any financing as long as any liens are still involved in any way on the property. This is why I have to get clear title to the land, and my lawyer insists that our proceedings thus far are . . . all in the right (and only) direction.

[6] The letter nevertheless outlined two courses of possible action without holding out much hope that either would resolve the problems, stating in part:

> I can apply to have it taken out of conserv., but this will take90 [sic] to 120 days for a hearing (along with a $50 fee) and then 60 to 90 days for a decision, which could very likely be "NO". Then I could appeal and go through the whole thing again. The alternative is to leave it in conservation and apply to build only ONE house on it which might be turned down endlessly because it is required, generally, that a property in conservation have two acres per house.

portion of the land. Although he warned the Smalls that the financial predicament he was in could force a sale of the part on which they had hoped to build a home, he reiterated an intention not to overlook their stake in the project in any event. And his promise was: "I would, upon receipt of cash, pay you a substantial amount to cover your costs and expenses for the time you owned the land so you would not have to come out a loser on the deal." Letter from Mr. and Mrs. Badenhop to Mr. and Mrs. Small (Apr. 7, 1966).

The letters that followed, however, informed the Smalls that the drastic step of selling part of the buildable land had not been taken and Badenhop had renewed his efforts to bring their development project to fruition by applying for a land use district boundary amendment. But no action on the petition to change the use designation of the property from conservation to urban had been taken by the Land Use Commission before the Smalls returned to Hawaii in December of 1966.

The Smalls lived on Oahu for several years after their return, but moved to Maui in 1970 and lived there until 1980. They remained on friendly terms with the Badenhops even after moving to Maui, at least until 1973. On one occasion Alvin Badenhop stayed at their residence for several days while on a business trip.

Charles Small became ill and was hospitalized in early 1973. Though he recovered, the illness apparently caused Small and his wife to give more than passing thought to the Kailua property they once owned and the "arrangement" with the other couple. The Smalls wrote the Badenhops on April 11, 1973, asking for their thoughts on the matter.[7] But there was no response to the request, and the letter marked the end of correspondence between the couples.

---

[7] The letter read in part:

Ruth and I have made the necessary trips to the Attorney ironing out the idiosyncrasies of wills, life tenancy and so on and on! The arrangement with you and the correspondence concerning the Koohoo property has been discussed and the lawyer suggested that a definite agreement be made.

I have been hoping to get over there so we could talk story but between lack of business and breakdowns that I have had to repair there seems little time left over.

Give this a thought or two and let us hear of your thinking —

Letter from the Smalls to the Badenhops (Apr. 11, 1973).

The Badenhops, who had managed to obtain the necessary permits and constructed a residence on the Kailua property in 1970, left Hawaii in 1975. They lived abroad until September of 1979, when they returned to their island home. They moved to California several years later, and the house they built on the land in question is now occupied by their son. But title to the property still stands in the name of Alvin Badenhop.

Charles and Ruth Small[8] brought suit on March 6, 1980, shortly after the Badenhops returned to Hawaii, seeking relief "by reason of the Defendants' refusal to carry out verbal promises made, resulting in [their acquisition of] paper title." The complaint failed to survive a dismissal motion, and the plaintiffs pleaded anew. The amended complaint contained averments supporting a "constructive trust-unjust enrichment" theory of liability.

The defendants moved successfully for summary judgment. But upon reconsideration sought by the plaintiffs the circuit court set the initial judgment aside, and the case proceeded to trial in due time. After considering the evidence adduced by the parties, the court adopted the findings proposed by the plaintiffs. Yet it concluded their claim was barred "by reason of laches and the statute of limitations" and entered judgment for the defendants, the parties being ordered to "bear their own costs and fees." Both plaintiffs and defendants now seek review of the judgment.

II.

On appeal, the plaintiffs argue the circuit court erred in concluding their claim was time-barred. They maintain there was more than ample evidence to sustain the imposition of a constructive trust on the property now owned by Alvin Badenhop and the claim for equitable relief was asserted in timely fashion. The defendants take issue with (1) the court's vacation of the summary judgment initially awarded to them, (2) the court's decision not to adopt the findings of fact and conclusions of law they proposed, (3) the denial of costs and attorney's fees, and (4) the denial of the motion to dismiss Patricia Badenhop as a defendant. We begin by considering

---

[8] Ruth Small died on April 6, 1981, before commencement of the trial.

the circumstances under which Alvin Badenhop acquired the property.

## A.

The circuit court found the Smalls and the Badenhops "became close friends over the years," the Smalls "placed full trust and confidence" in Alvin Badenhop, and they "relied on [his] promises and representations as a friend and business associate."[9] It further found they "acted in good faith and worked cooperatively and in concert with the [Badenhops] at all times in attempting to improve, subdivide or sell" the land in question.[10] To further this attempt the Smalls upon request of Alvin Badenhop transferred title to a parcel of land, which they had purchased for $1,500, to him for a nominal consideration and also made it possible for him to acquire another parcel, which they had originally agreed to buy, for less than its actual value.[11]

It is a truism that "[a] person confers a benefit upon another if he gives to the other possession of or some other interest in

---

[9] The trial judge's findings Nos. 23 and 24 read:

23. Plaintiffs and Defendants became close friends over the years and visited each other socially on a few occasions. Both Mrs. Small and Mrs. Badenhop belonged to the same music club and their husbands worked on several projects together, although none of the projects materialized into actual jobs.

24. Plaintiffs relied on the promises and representations of Defendant Alvin Badenhop as a friend and business associate and placed full trust and confidence in their dealings with him.

[10] Finding No. 25 reads:

25. Plaintiffs acted in good faith and worked cooperatively and in concert with the Defendants at all times in attempting to improve, subdivide or sell the subject properties.

[11] Findings Nos. 29 and 30 read:

29. Defendant Alvin Badenhop purchased Lot 68 from Robert A. Obrock, executor of the estate of Agnes Kaiulani Chalmers, deceased, by way of an agreement of sale dated April 1, 1965, at the purchase price of $15,986.66 (down payment of $705.58 plus balance of $15,281.08). (Ex. 7).

30. According to the testimony of Plaintiffs' expert witness, Maurice I. Takasaki, the value of the subject properties consisting of a total of 39,232 square feet was $1.15 per square foot in 1965, or a total of $45,116.80, and the value of the subject properties in 1983 is $4.40 per square foot, or a total of $172,620.80.

money, land, chattels, or choses in action, . . . , or in any way adds
to the other's security or advantage." *Restatement of Restitution* § 1
comment b (1937). One who receives a benefit is of course en-
riched, and he would be unjustly enriched if its retention would be
unjust. *Id.* § 1 comment a. And it is axiomatic that "[a] person who
has been unjustly enriched at the expense of another is required to
make restitution to the other." *Id.* § 1. We realize unjust enrich-
ment is a broad and imprecise term defying definition.[12] But in
deciding whether there should be restitution here, we are guided
by the underlying conception of restitution, the prevention of in-
justice. *See* A. Denning, *The Changing Law* 65 (1953).[13]

That the Badenhops reaped a benefit from the abortive devel-
opment scheme is obvious; despite their tribulations they gained
ownership of valuable real estate and were able to build a home on
the property. The persons who conferred the benefit, however,
have nothing to show for the attempt "to improve, subdivide or
sell" the land in concert with their erstwhile friends. This is so
because they trusted Alvin Badenhop and transferred possession
of land for a nominal sum and relinquished a right of redemption

---

[12] In the words of the author of a highly regarded treatise on restitution:

> Unjust enrichment is an indefinable idea in the same way that justice is
> indefinable. But many of the meanings of justice are derived from a sense of
> injustice, and this is true of restitution since attention is centered on the
> prevention of injustice. Not all injustice but rather one special variety: the
> unjust enrichment of one person at the expense of another. This wide and
> imprecise idea has played a creative role in the development of an important
> branch of modern law.

1 G. Palmer, *The Law of Restitution* § 1.1 (1978) (footnote omitted).

[13] Lord Denning's statement reads:
> Underlying all the law of restitution is the conception that no one should
> unjustly enrich himself at the expense of his neighbour. This conception is
> too indefinite to be stated as a principle of law: but it sufficiently indicates a
> new category. Just as the conception of contract is the enforcement of prom-
> ises, and the conception of tort is damages for wrongdoing, so the conception
> of restitution is the prevention of unjust enrichment. Once this category
> comes to be accepted into the law, the courts will no longer find themselves
> forced to fit all remedies into the straitjackets of contract and tort, but will be
> able to develop a comprehensive category with its own distinct principles.

A. Denning, *The Changing Law* 65 (1953).

though they had "paid approximately $7,000.00 on their agreement of sale."[14]

Where "confidence has been reposed and betrayed" we have not allowed technical considerations to stand as barriers to equitable relief. *Meheula v. Hausten,* 29 Haw. 304, 314 (1926). We said in *Meheula* that

> [t]he term fiduciary or confidential relation . . . is a very broad one. It has been said that it exists, and that relief is granted, in all cases in which influence has been acquired and abused, — in which confidence has been reposed and betrayed. The origin of the confidence and the source of the influence are immaterial. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in and relies upon another. The only question is, does such a relation in fact exist?

*Id.* (citations omitted). The circuit court found such a relation existed,[15] we have no reason to overturn the determination,[16] and we think the Smalls' trust was misplaced. *See Fairfield v. Medeiros,* 50 Haw. 73, 431 P.2d 296 (1967); *Ruebsamen v. Maddocks,* 340 A.2d 31, 35-36 (Me. 1975). It would be unjust if the Badenhops were permitted to retain the entire benefit of the transactions, and they ought to make restitution.[17]

---

[14] Finding No. 12 reads:

> 12. From August of 1959 to July of 1964, Plaintiffs had paid approximately $7,000.00 on their agreement of sale, consisting of the down payment of $500.00, the monthly payment of $100.00 for 62 months from May 1959 to June 1964, and the property taxes.

[15] *See supra* notes 9, 10, and 11.

[16] "It [is] peculiarly the province of the chancellor, who heard and saw the witnesses testify in open court . . . , to determine the truth of the controversy. A chancellor's finding of fact from conflicting testimony heard by him will not be disturbed on review unless clearly against the preponderance of the evidence." De Mello v. De Mello, 34 Haw. 922, 933 (1939) (citation omitted); *see also* Hawaii Rules of Civil Procedure (HRCP) Rule 52(a).

We see no reason here to disturb the circuit court's findings of fact.

[17] Though title to the two parcels stands in the name of Alvin Badenhop and he was the prime mover as far as the transactions were concerned, the circuit court found Mrs. Badenhop also benefited from the transactions:

> 28. Defendant Patricia Badenhop was fully aware of the project or deal between the parties in that she made the initial contact with Plaintiffs in 1959

B.

Turning to the question of how injustice may best be averted here, we note the plaintiffs prayed for the imposition of a constructive trust. "A constructive trust is [one way] through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity [may convert] him into a trustee." *Beatty v. Guggenheim Exploration Co.*, 225 N.Y. 380, 386, 122 N.E. 378, 380 (1919) (Cardozo, J.) (citations omitted) *quoted in* 5 A. Scott, *The Law of Trusts* § 462 (3d ed. 1967). Still, the imposition of a trust may not be apt in the circumstances.

A party entitled to restitution may have in an appropriate situation one or more of the following remedies: (1) the use of self-help, (2) specific restitution of the subject matter, (3) the imposition of a constructive trust, (4) the enforcement of an equitable lien, (5) the subrogation of the party to the position of a prior claimant, or (6) an order for the payment of money by the person who received the benefit. *See Restatement of Restitution* § 4.[18] We can summarily rule out all but the third and fourth remedies in the situation at hand.

We need not dwell on the first, second, fifth, and sixth alternatives, for they are obviously tailored to meet other situations. At

---

regarding Lot 68, that she was involved with her husband in obtaining the necessary financing to purchase Lot 68, that she fully participated with her husband in the construction of their home on Lot 68, that she was cognizant of the letters which Plaintiff Charles Small sent to her husband, some of which were addressed to her, that she agreed with her husband that Plaintiffs "should be able to hold the right to obtain that portion of the lot" (Ex. C-31), that the last letter of April 11, 1973 from the Plaintiffs were [sic] addressed to her husband and herself, that she and her husband were co-owners of the Lala Place property which was sold to purchase Lot 68, and that as the wife of Defendant Alvin Badenhop she had a dower interest then and a statutory interest now (upon death of her husband) in the subject properties on which they built their home.

[18] Section 4 of the Restatement reads:

In situations in which a person is entitled to restitution, he is entitled, in an appropriate case, to one or more of the following remedies:

(a) the use of self-help to regain or to retain possession of land or chattels;

(b) a judgment by a court of law enforced by a writ directing a sheriff or other officer of the court to seize and restore the subject matter to him;

first blush it appears the imposition of a trust through the entry of "a decree . . . that the title or possession of the subject matter be transferred" to the plaintiffs may be proper. Yet, what we are seeking is a way "to prevent a loss to the plaintiff and a corresponding gain to the defendant, and to put each of them in the position in which he was before the defendant acquired the property." *Id.* § 160 comment d. The imposition of a constructive trust on the subject property would not have the desired effect. It would provide a remedy inconsistent with the fundamental precepts of restitution, for it would give the plaintiffs more than they had.[19]

Restitution, however, may be accomplished "not only by . . . compelling the surrender . . . of property . . . , but also by imposing an equitable lien upon the property in favor of the plaintiff." *Id.* § 161 comment a. The *Restatement* articulates of the pertinent principle in these terms:

Where property of one person can by a proceeding in equity be reached by another as security for a claim on the ground that otherwise the former would be unjustly enriched, an equitable lien arises.

*Id.* § 161. We think injustice could be prevented here by the establishment of a proper lien on the subject property. *See Coelho v.*

---

(c) a decree by a court of equity that the title or possession of the subject matter be transferred to him or that a cause of action or other right be reinstated;

(d) a decree by a court of equity that a lien upon the subject matter or its proceeds be established, enforced, discharged, or reduced;

(e) a judgment or decree by which the transferor is subrogated to the position of another claimant against the transferee;

(f) a judgment at law or decree in equity for the payment of money, directly or by way of set-off or counterclaim.

[19] It has been suggested that a constructive trust may be imposed upon a fractional interest in property. *Restatement (Second) of Restitution,* Tentative Draft No. 2, § 30 (1984) reads in part: "(3) Property subject to a constructive trust or an equitable lien may be title to, or a limited or fractional interest in, one or more assets, either tangible or intangible." *See also* Provencher v. Berman, 699 F.2d 568, 569 (1st Cir. 1983) (plaintiff who was entitled to some but not entire real property could assert lien for amount invested or claim proportionate share of real estate); *but cf.* Brown v. Brown, 190 Conn. 345, 348, 460 A.2d 1287, 1289 (1983) ("A constructive trust is not ordinarily established in a portion of an indivisible asset."). We do not rule out the possibility of imposing a constructive trust on a fractional interest in property in an appropriate case.

*Fernandez,* 46 Haw. 578, 593, 384 P.2d 527, 535 (1963) (citing *King v. Thompson,* 34 U.S. 204 (1835)).

### III.

Agreeing with the Smalls that the record manifests a betrayal of trust, we address their contention that the circuit court erred in ruling the claim for relief was untimely. The court, as we observed at the outset, purported to rely on both "laches and the statute of limitations" in awarding judgment to the defendants. Inasmuch as the plaintiffs invoked the court's power to do equity, our primary concern is with laches.

### A.

"Some degree of diligence in bringing suit is required under all systems of jurisprudence." *Patterson v. Hewitt,* 195 U.S. 309, 317 (1904). "The doctrine of laches reflects the . . . maxim that 'equity aids the vigilant, not those who slumber on their rights.' 2 S. Symons, *Pomeroy's Equity Jurisprudence* § 418 (5th ed. 1941). Where applicable, it acts to bar a court from considering an equitable action. . . ." *Adair v. Hustace,* 64 Haw. 314, 320-21, 640 P.2d 294, 300 (1982) (footnote omitted). It is founded on "a perception that it is . . . equitable to defendants and important to society to promote claimant diligence, discourage delay and prevent the enforcement of stale claims." *Id.* at 321, 640 P.2d at 300 (citation omitted).

A court of equity, therefore, will only consider a claim brought without unreasonable delay. *Id.* More explicitly, the court will entertain a suit if it has been "brought without undue delay after plaintiff knew of the wrong or knew of facts and circumstances sufficient to impute such knowledge to him" and the time lapse has not "resulted in prejudice to the defendant." *Id.* (citing 3 S. Symons, *Pomeroy's Equity Jurisprudence* § 917 and W. McClintock, *Equity* § 528 (2d ed. 1948)). Prejudice has been found, for example, where fading memories or death has caused the loss of evidence, where changes in the value of the subject matter or in the defendant's position have occurred, and where there are intervening rights of third parties. *Id.* (citing W. McClintock, *supra*). And whether a claim is barred by laches is "determined by the circumstances of each particular case." *Patterson v. Hewitt,* 195 U.S. at 317.

## B.

Here, the circuit court found that the Smalls placed "full trust and confidence" in Alvin Badenhop, "relied on [his] promises and representations," and "acted in good faith . . . in attempting to improve, subdivide or sell" the subject property. *See supra* notes 9 and 10. Yet it concluded that time to assert their claim began running on August 8, 1965, precisely when the smaller parcel of land was conveyed to Alvin Badenhop upon his representation that this was necessary "to save [the parties'] interests" and a promise that the nominal consideration tendered "by no means represent[ed] the amount [that would be paid] eventually."[20] The illogic of charging the trusting Smalls with knowledge of Badenhop's perfidious design under these circumstances is patent and needs no belaboring.

Still, we cannot agree with the plaintiffs that the defendants' failure to expressly repudiate their promises and representations disposes of contentions that the claim was barred by inordinate delay. True, the Badenhops never bothered to respond to a plea that thought be given to the "arrangement" concerning the property. Nonetheless, it was incumbent upon the plaintiffs to pursue the claim without undue delay once "the facts and circumstances" bespoke the end of any joint effort to "improve, subdivide or sell" the subject property. This, in our view, occurred when the Badenhops constructed a residence on the property near the end of 1970, for the Smalls could not have realistically assumed thereafter that Alvin Badenhop was still "attempting to improve, subdivide or sell" the property.

At first glance it appears laches should bar a claim brought more than nine years after knowledge of the wrong could be imputed to the plaintiffs. But upon closer examination of the perti-

---

[20] The court's conclusion in this regard was:

1. Plaintiff Charles Small and Defendant Alvin Badenhop had discussions concerning improvement of the lots in question commencing in or about 1959, and Plaintiffs executed a quitclaim deed dated August 8, 1965 in furtherance of such discussions. It is this date which the Court determines as commencing the apparent cause of action which Plaintiffs had against the Defendants.

nent circumstances, we are convinced the doctrine should not be applied in this instance.

"A court of equity is not bound by the statute of limitations, but, in the absence of extraordinary circumstances, it will usually grant or withhold relief in analogy to the statute of limitations relating to law actions of like character." *Yokochi v. Yoshimoto,* 44 Haw. 297, 300, 353 P.2d 820, 823 (1960) (citations omitted). The analogous statute in our opinion is Hawaii Revised Statutes (HRS) § 657-1 (1976 & Supp. 1984); it provides that the actions described therein "shall be commenced within six years next after the cause of action accrued."[21] But "if, after the cause of action has accrued, the [defendant] departs from and resides out of the State, the time of his absence shall not be deemed or taken as any part of the time limited for the commencement of the action." *See* HRS § 657-18 (1976).

The Badenhops left for Saudi Arabia in late 1975; they returned to their Kailua home in September of 1979; and the Smalls instituted these proceedings in March of 1980. Under the guiding statute of limitations the time of the Badenhops' absence from Hawaii would not be taken as any part of the limitation period, and the Smalls' suit would be deemed a timely one. Thus we would have to say the delay, though long, was not unduly so in the particular circumstances.

---

[21] The analogous limitation statute reads:

§ 657-1 Six years. The following actions shall be commenced within six years next after the cause of action accrued, and not after: ·

(1) Actions for the recovery of any debt founded upon any contract, obligation, or liability, excepting such as are brought upon the judgment or decree of a court; excepting further that actions for the recovery of any debt founded upon any contract, obligation, or liability made pursuant to chapter 577A shall be governed by chapter 577A;

(2) Actions upon judgments or decrees rendered in any court not of record in the State, or, subject to section 657-9, in any court of record in any foreign jurisdiction;

(3) Actions for taking or detaining any goods or chattels, including actions in the nature of replevin;

(4) Personal actions of any nature whatsoever not specifically covered by the laws of the State.

HRS § 657-1 (1976 & Supp. 1984).

## C.

While the time within which the Smalls brought suit, measured in terms of the guiding statute, was not unduly long, laches would still serve to bar their claim if the time lapse resulted in prejudice to the Badenhops. *Adair v. Hustace,* 64 Haw. at 321, 640 P.2d at 300. Any delay would be likely, of course, to have prejudicial results, the most likely one being fading memories and the concomitant loss of evidence. Yet it appears the parties were not particularly troubled in this regard.

The key transactions in this case were those effected while the plaintiffs resided in Samoa. The transactions were officially recorded, and the surrounding events, as well as the accompanying thoughts of the parties, were memorialized in the correspondence of the parties. Most of the letters were not discarded, and they yielded much of the telling evidence. We cannot say delay resulted in the loss of evidence.

Nor can we say the death of one of the parties prejudiced the defendants, for it was one of the plaintiffs who died before the case could be tried. To be sure, there was a substantial increase in the value of the subject property as defendants contend; and if a constructive trust were imposed, they might have reason to claim prejudice. But enhanced property values can be taken into account in fashioning a just remedy. *See, e.g., Food Pantry, Ltd. v. Waikiki Business Plaza, Inc.,* 58 Haw. 606, 614, 575 P.2d 869, 876 (1978) ("[T]he trial court is empowered to fashion a decree to meet the requirements of the situation and to conserve the equities of the parties."); *Fleming v. Napili Kai, Ltd.,* 50 Haw. 66, 70, 430 P.2d 316, 319 (1967) ("[T]he court of equity has plenary power to mold its decrees in such form as to conserve the equities of all parties . . . .").

The decision that plaintiffs were entitled to judgment renders it unnecessary to consider the matters raised in the defendants' cross-appeal. The judgment of the circuit court is vacated, and the case is remanded with instructions that an appropriate equitable remedy be entered.

*Earl S. Robinson,* A Law Corporation, for appellants, cross-appellees.

*Ronald S. Adelman,* for appellees, cross-appellants.